# United States Court of Appeals for the Federal Circuit

---

**ERIC MOTE,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2024-1257

---

Appeal from the United States Court of Federal Claims in No. 1:23-cv-00084-EGB, Senior Judge Eric G. Bruggink.

---

Decided: August 6, 2024

---

ERIC MOTE, Calhan, CO, pro se.

JAMES WILLIAM POIRIER, I, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, LOREN MISHA PREHEIM.

---

Before LOURIE, STOLL, and STARK, *Circuit Judges*.

PER CURIAM

Eric Mote appeals the decision of the United States Court of Federal Claims (the "Claims Court") denying his request for removal of a Letter of Admonishment ("LOA") and a Non-Judicial Punishment ("NJP") from his military records and back pay in the amount of the fine associated with the NJP. *See Mote v. United States*, 168 Fed. Cl. 488 (2023) ("*Decision*"). The court granted judgment on the administrative record in favor of the government upholding the decision of the Air Force Board for Correction of Military Records ("AFBCMR") denying his requested relief. For the following reasons, we affirm in part, vacate in part, and remand.

## BACKGROUND

Mote held the rank of Captain in the United States Air Force prior to being separated from service in a court-martial. *Id.* at 490 n.1; S.A.[1] 171. The LOA, NJP, and fine associated with the NJP at issue on appeal stem from a series of actions taken by Mote following the denial of his application for "White Heritage Month" as a special observance at Hill Air Force Base. *See generally Decision* at 490–95.

In 2015, Mote submitted a request to the wing commander, Colonel Ronald Jolly, to establish a special observance for White Heritage Month. Colonel Jolly denied the request after Mote failed to provide additional requested information. Several months later, Mote submitted a more detailed application claiming that White Heritage Month would help combat certain white racial stereotypes, terms, and jokes. Colonel Jolly denied his second request as well.

Following the second denial, Mote contacted the Equal Opportunity Office requesting justification for Colonel

---

[1] S.A. refers to the Supplemental Appendix filed by the Government. ECF No. 12.

Jolly's decision. In his complaint, he maintained that he was simply seeking "a special observance that is on equal footing with all other special observances" and then went on to seemingly accuse the Air Force of racial discrimination against people who are white. S.A. 37 (asking if it was Air Force policy "not to condone or tolerate unlawful discrimination, to include sexual harassment, of any kind, UNLESS the victims are white"); *see also Decision* at 491 (excerpting additional accusatory language from Mote's complaint).

Two weeks later, on February 22, 2016, Mote forwarded his complaint to Colonel Jolly with the following demand: "Please provide me with a complete list of changes I need to make to my application in order to get White Heritage Month approved." S.A. 39. Following that email, Mote was called to a meeting with his superior officers: Colonel Scott Jones and Colonel Eric Felt. In the meeting, Colonel Jones instructed Mote that he could continue to pursue White Heritage Month but to follow "the proper channels," "to be careful about professionalism when you go back at a wing commander[,]" and to "remember [his] military decorum in the process." S.A. 41–42.

Shortly thereafter, on March 10, 2016, Mote sent another email directly to wing commander Colonel Jolly accusing him of intimidation, racial discrimination, and various violations of the Air Force Instructions (AFI). S.A. 44 ("Not only did you fail to reply to that email, you instead sicced my chain of command on me in an apparent attempt to intimidate me - probably not the most effective strategy . . . ."); *id.* ("[T]here is no need for these dubious and diversionary tactics. Just be straightforward and send me a memo that says, 'Capt Mote, I will never approve your application for White Heritage Month because I have chosen to perpetuate my current policy of anti-white discrimination at this installation, so stop asking me.'"); *id.* ("[Y]our disparate treatment of whites compared to other races violate[s] numerous provisions of AFI 36-2706 . . . ."). Colonel

Jolly forwarded that email to Colonel Jones. *Decision* at 491.

As a result of Mote's email, the Air Force, through Colonel Jones, issued Mote an LOA for being disrespectful towards Colonel Jolly, a superior commissioned officer. The LOA explained that Mote had specifically been instructed regarding professionalism and that Colonel Jones considered Mote's latest email a "blatant disregard for [his] previous instructions" and a "direct violation of Article 89 of the [Uniform Code of Military Justice ("UMCJ")], [10 U.S.C. § 889], - Disrespect toward a superior commissioned officer." S.A. 47. Mote responded to the LOA after being given the opportunity to consult with an Air Force attorney. His response was considered and rejected, and the LOA was ordered to remain in effect.

Following receipt of the LOA, Mote filed a variety of complaints that were dismissed, denied, or found unsubstantiated. *See Decision* at 492 (describing his reprisal, discrimination, and Inspector General complaints); S.A. 96–98, 107–08 (application for redress to Colonel Jones for alleged wrongs committed against him by Colonel Jones); S.A. 110–14, 116 (complaint against Colonel Jones elevated to Major General Scott Jansson). One of those complaints requested a Commander Directed Investigation ("CDI") into alleged mistreatment of him at the base's diversity festival after his request for a White Heritage booth was rejected. Rather than find mistreatment of Mote, the CDI report found that Mote was "looking for a fight," "annoying . . . booth attendants and guests," and "baiting" and "laughing" at his subordinate in a conversation about his White Heritage booth application. S.A. 86 (internal quotation marks omitted).

On January 9, 2017, an email containing policy letters signed by Colonel Jones was transmitted to his command. One of those policy letters was a memorandum concerning "Air Force Equal Opportunity and Sexual Harassment."

S.A. 120, 123. A few hours later, Mote responded to that memorandum by sending the following email to Colonel Jones and copying General Jansson:

> The Equal Opportunity Zero Tolerance memo you sent out today generated quite a bit of laughter around the office here. We decided to make a few corrections so the policy would be a little more representative of reality:
>
> The ICBM Systems Directorate strives to maintain an anti-white discriminatory work environment, without regard to how many man-hours it wastes or how detrimental it is to the unit's effectiveness. I am determined to ensure that everyone can discriminate against whites in an environment free of consequences.
>
> I have Zero Tolerance for anyone who alleges unlawful discrimination. Objecting to wrongful conduct, making accusations against my friends, filing complaints against anyone of a higher rank, or drawing attention to my arbitrary disregard for federal regulations and Air Force standards will not be tolerated in any instance.
>
> My "Equal Opportunity" Zero Tolerance policy is just a legal formality that I have to publish from time to time. Mostly I use it to deceive complainants into thinking I have any concern for them or that I will help them resolve issues, when in fact I and my staff will use information reported to me to assist further in the discrimination and harassment efforts that the complainants are already enduring.
>
> If you or any member of your team has been accused of unlawful discrimination, immediately report it to me so I can take reprisal against your accuser and begin preparing false statements to

> disrupt the investigation so as to prevent any potentially adverse effects to your career.
>
> As Airmen, we must ensure we maintain an environment free of allegations and complaints. By following the guidance in this memorandum, we can make sure all my friends look good in front of their promotion boards and we can prevent horrible problems like honesty, consistency, and sincerity from interfering with our critically important career paths.
>
> Integrity First – we'll dump the other core values later.

S.A. 122.

A few days later, on January 13, 2017, Mote sent a second email to Colonel Jones and General Jansson, reproduced below:

> At yesterday's All Call, you [Colonel Jones] didn't seem to understand the reason for the snickering and mumbling from the crowd. Let me explain.
>
> You started out by announcing your "zero tolerance" policies—you don't tolerate this behavior or that behavior. Zero tolerance! Then, a couple slides later, you pulled up the "Diversity & Inclusion Continuum":
>
> Hate—Intolerance—Tolerance—Acceptance—Inclusion
>
> You explained that hate is bad, and that we need to move everything toward inclusion. At this point, people were thinking, "So, where does your *zero tolerance* stuff align on this continuum? Pretty far to the left, yeah?"
>
> You essentially argued that your policies are hateful and illegitimate and should be done away with.

> That's why people were murmuring about—that you were standing up there as if you were completely unaware of the hypocrisy of your own statement.
>
> That is why your employees don't take this unit seriously. We all put down our work yesterday, drove across the base, piled into an auditorium, and spent an hour listening to a rote recitation of directorate policies that fully contradicted each other. When we got back to our desks, we didn't know whether we were supposed to be executing the mission, or lighting a candle, holding hands, gazing into each other's eyes, singing kumbaya, and blabbing nebulously about inclusion. Actually, instead of doing either of these, folks mostly sat around mocking and laughing about all of this.
>
> Diversity is all we do!—excellence is outdated and politically incorrect.

S.A. 124.

On January 17, 2017, as a result of those two emails, General Jansson charged Mote with violation of Article 89–disrespect towards a superior commissioned officer–in an NJP proceeding under UCMJ, Article 15, 10 U.S.C. § 815. S.A. 126–30. Mote was assigned a military defense counsel and given 72 hours to accept the NJP or request a court-martial in lieu of the NJP. On January 17, 2017, Mote's counsel advised him that it would be in his best interest to proceed in the Article 15 forum, as his proposed defenses were very unlikely to succeed in court-martial. *See Decision* at 494. Prior to the 72-hour deadline, but after Mote responded to the NJP, his counsel responded with a more detailed case analysis. S.A. 145, 147–50. Her advice, however, remained the same. S.A. 145 ("As such, my advice remains the same as when we last spoke; that it's in your best interest to fight this in the Article 15 forum, as the defense is very unlikely to be successful at court.").

On January 20, 2017, Mote submitted his response to the NJP, pleading not guilty and raising several affirmative defenses. S.A. 132–35; *see* S.A. 49–50. Mote argued (1) that Colonel Jones was not entitled to Article 89 protections because of Colonel Jones's alleged prior misconduct towards Mote and (2) that these two emails were protected communications under the Military Whistle Blower Protection Act ("MWPA"), 10 U.S.C. § 1034. S.A. 132–35.

On January 23, 2017, General Jansson found Mote guilty of disrespect towards a superior officer based on the two emails sent to Colonel Jones. S.A. 130. As punishment, Mote was reprimanded and required to forfeit $2,828 of pay over a period of two months. *Id.* Mote's appeal of the NJP was subsequently rejected.

On June 7, 2017, Mote filed an application to the AFBCMR requesting (1) that the LOA issued on March 18, 2016, be removed from his records and (2) that the NJP under Article 15 imposed on January 23, 2017, be declared void and removed from his records. S.A. 3. The AFBCMR considered Mote's arguments and advisory opinions from the Air Force Personnel Center and the Air Force Legal Operations Agency ("AFLOA/JAJM") and "concur[ed] with the rationale and recommendation of [Air Force Personnel Center] and AFLOA/JAJM." S.A. 7; *see also* S.A. 302–04 (AFLOA/JAJM advisory opinion). It denied Mote's application, finding "insufficient evidence of an error or injustice" and "insufficient evidence to conclude [Mote was] the victim of reprisal in violation of 10 USC [§] 1034." S.A. 1.

On January 20, 2023, Mote filed a complaint in the Claims Court seeking review of the AFBCMR decision. *Decision* at 490. He requested removal of the LOA and NJP from his military records and back pay for the amount of the fine associated with the NJP. *Id.* The parties filed cross-motions for judgment on the administrative record. *Id.* The Claims Court granted the government's motion, holding that the AFBCMR's conclusion that Mote was not

the victim of error and injustice was not arbitrary or capricious because the LOA and NJP were supported by substantial evidence. *Id.* at 500. The court also held that the AFBCMR's conclusion that neither the LOA nor NJP were an illegal reprisal was supported by substantial evidence. *Id.* at 503.

Mote timely appealed.

## DISCUSSION

### I

We begin with jurisdiction, as "the court is bound to ask and answer for itself" whether jurisdiction is proper "even when not otherwise suggested." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)). We have jurisdiction to review a decision of the Claims Court pursuant to 28 U.S.C. § 1295(a)(3). However, that does not end our inquiry because the record before us raises questions concerning the jurisdiction of the Claims Court. "On every . . . appeal, the first and fundamental question is that of jurisdiction, first, of [the appellate] court, *and then of the court from which the record comes*." *Steel Co.*, 523 U.S. at 94 (emphasis added). "The requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception.'" *Id.* (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). If jurisdiction does not exist, "the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). We review a decision of the Claims Court that it had subject matter jurisdiction *de novo*. *Nicely v. United States*, 23 F.4th 1364, 1367 (Fed. Cir. 2022).

Mote's complaint argues that the Claims Court has jurisdiction over his claims under the Tucker Act, 28 U.S.C. § 1491, and the Military Pay Act, 37 U.S.C. § 204. *Mote v. United States*, 1:23-CV-00084-EGB, ECF No. 1, ¶¶ 1–2

(“Complaint”). His complaint asserts that while the LOA “is not an independent cause of action” because it “did not involve a monetary injury,” it is “a collateral issue” to the NJP action granting the court jurisdiction under the Tucker Act. *Id.* at ¶ 8. As relief, Mote requests that the Claims Court (1) remove the LOA from his military records, (2) remove the NJP from his military records, and (3) award him back pay in the amount of the fine associated with the NJP. *Id.* at ¶ 60. The government does not dispute jurisdiction and broadly asserts that “[t]here is binding precedent that this Court possesses jurisdiction to review *all decisions* made by a board for the correction of military records.” Inf. Resp. Br. 2 (citing *Friedman v. United States*, 310 F.2d 381, 396 (Ct. Cl. 1962)) (emphasis added). However, the government then walks back that broad assertion by noting that *Friedman* “was based upon silence in the statute establishing the correction boards,” *id.*, and that, “absent congressional authorization for the [Claims Court] to consider a claim against the United States, the Court does not possess authority to consider the claim or to grant relief,” *id.* at 3 (citing *United States v. Testan*, 424 U.S. 392, 399 (1976)); *see also Mote*, 1:23-CV-00084-EGB, ECF No. 15, 22–23 (asserting the same at the Claims Court).

The Claims Court seemingly agreed with the government’s broad assertion and found that it had jurisdiction to review Mote’s claims, stating:

> This court has jurisdiction to review the decisions of military corrections boards, including the Air Force Board for Correction of Military Records. *Friedman v. United States*, 159 Ct. Cl. 1, 26 (1962). As plaintiff is seeking back pay for his two months of forfeited pay under the NJP, this case falls within the Tucker Act, 28 U.S.C. § 1491. *See Lewis v. United States*, 458 F.3d 1372 (Fed. Cir. 2006).

*Decision* at 495.

But *Friedman* does not stand for such a broad proposition as to grant the jurisdiction to review all decisions of military corrections boards. *See generally Friedman*, 310 F.2d at 389–92, 396–97 (addressing the Court of Claims' jurisdiction with respect to retirement disability pay and claim accrual following a decision of a corrections board). *Friedman* stands for the "general rule" that a "cause of action for disability retirement benefits in the [Claims Court] did not accrue until . . . the first competent board[] finally denied [the] claim." *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005); *see also id.* at 1223–27 (discussing *Friedman* at length). In fact, other decisions of the Court of Claims recognized that it lacked jurisdiction to correct military records without the correction implementing a money judgment. *See, e.g.*, *Grieg v. United States*, 640 F.2d 1261, 1266 (Ct. Cl. 1981) ("One thing is clear, the court cannot itself correct a simple injustice or direct a correction board to do so, without the correction implementing a money judgment."). We therefore disagree with the government's and the Claims Court's broad assertion of jurisdiction over decisions of military correction boards. It is a long "settled proposition[] that the [Claims Courts]' jurisdiction to grant relief depends wholly upon the extent to which the United States has waived its sovereign immunity to suit and that such a waiver cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969).

The Tucker Act grants jurisdiction to the Claims Court over certain actions for monetary relief against the United States. 28 U.S.C. § 1491. The Tucker Act itself does not create a substantive cause of action; rather, a plaintiff must identify a separate source of substantive law that is "money-mandating." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). The Military Pay Act, 37 U.S.C. § 204, has previously been held to be a money-mandating statute. *See James v. Caldera*, 159 F.3d 573, 581 (Fed.Cir.1998) (stating that 37 U.S.C. § 204 "serves as

a money-mandating statute"); *but see Nicely*, 23 F.4th at 1368 ("[W]e have held that the MWPA[, 10 U.S.C. § 1034,] is not a money-mandating statute."). Mote's claim for military back pay therefore falls within the court's jurisdiction. *See Decision* at 495 ("As plaintiff is seeking back pay for his two months of forfeited pay under the NJP, this case falls within the Tucker Act, 28 U.S.C. § 1491.").

The Claims Court, however, "has no power to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment." *James*, 159 F.3d at 580 (cleaned up). The Tucker Act expressly grants the Claims Court power only to order the "correction of applicable records" that are "incident of and collateral to" its award of a money judgment. 28 U.S.C. § 1491(a)(2); *Voge v. United States*, 844 F.2d 776, 781 (Fed. Cir. 1988). If there is "no reason to consider" correction of service records when deciding the claim for money damages, the Claims Court lacks jurisdiction to consider it. *Voge*, 844 F.2d at 781 ("[T]here must be 'sufficient nexus' between the money and the equitable claim for the Claims Court to consider [the] equitable claim."). Mote's claim for military back pay is for the salary that he forfeited as part of the NJP. *See* S.A. 130. It would therefore be necessary to consider the NJP to grant his requested back pay. The Claims Court therefore properly found jurisdiction over Mote's request for the removal of the NJP from his military records.

The record is not as clear for the LOA. Mote alleges that the LOA is "a collateral issue with significant bearing upon the later NJP action," Complaint, ¶ 8, and the LOA states that "future disrespectful conduct on your part will result in more severe action," S.A. 47. But, as detailed above, Mote received the LOA for disrespect towards Colonel Jolly based on his March 10, 2016 email, S.A. 47–48, and Mote received the NJP for disrespect towards Colonel Jones based on two separate, unrelated emails, S.A. 126–30. The NJP documentation references only the two emails sent to Colonel Jones and does not reference the LOA or

Mote's interactions with Colonel Jolly. *See id.* As we have raised the jurisdictional issue *sua sponte*, neither the Claims Court nor the parties were able to address whether the LOA was "incident of and collateral to" the monetary claim.

We therefore vacate the portion of the Claims Court's decision that purports to review the LOA and remand for a determination in the first instance if the LOA is "incident of and collateral to" the NJP and the associated fines and, thus, within its jurisdiction under the Tucker Act. *See James*, 159 F.3d at 580–81 (holding the removal of a bar to reenlistment was not incident of and collateral to a back pay claim); *see also Carman v. United States*, 602 F.2d 946, 948–49 (Ct. Cl. 1979) (holding that a claim for sick leave credit was incident of and collateral to a back pay claim).

## II

We next proceed to review of the decision of the Claims Court relating to the NJP.

We review a decision of the Claims Court "granting or denying a motion for judgment on the administrative record without deference." *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010). Applying the same standard of review as the court, "we will not disturb the decision of the AFBCMR unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Id.*; *Chappell v. Wallace*, 462 U.S. 296, 303 (1983). In reviewing the decisions of the AFBCMR, we do not substitute our judgment for that of the military "when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983). Relief from a corrections board decision will not be granted unless it is clear "by 'cogent and clearly convincing evidence that the correction board acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence.'" *Dodson v. United States*, 988 F.2d 1199, 1204–05 (Fed. Cir. 1993) (quoting

*Arens v. United States*, 969 F.2d 1034, 1037 (Fed. Cir. 1992)).

Because we have vacated and remanded the Claims Court's decision with respect to the LOA, we need only consider Mote's arguments as they relate to the NJP. Mote seems to argue that the NJP for disrespect to a superior commissioned officer was improper for three reasons: (1) that Colonel Jones was divested of his Article 89 protections because of alleged discrimination towards Mote at the base's diversity festival, (2) that his two emails to Colonel Jones were protected communications under the MWPA, and (3) that he was denied his Sixth Amendment rights in the 72 hours that he had to decide to accept the NJP or request a court-martial. Mote does not appear to argue that his emails to Colonel Jones were not disrespectful.

We first address Mote's argument that Colonel Jones was divested of any right to respect under Article 89. *See* Inf. Br. 10–11, 16–18. This argument was considered by both the Claims Court and the AFBCMR. *See Decision* at 499 ("[P]laintiff does not point to any specific evidence in the record of misconduct by Colonel Jones that would divest Colonel Jones of his protections . . . ."); S.A. 6 ("The commander's ultimate decision to impose NJP [was] based on the evidence of the case, including the extenuating and mitigating information provided by the applicant . . . ."); *see also* S.A. 303 ("Applicant contends he cannot be guilty of disrespect where his superiors refused to assist him. Quite simply, applicant presents no evidence, beyond his assertions, that he was unlawfully or unreasonably deprived of assistance . . . ."). Here, the standard of review "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence." *Heisig*, 719 F.2d at 1157 (emphasis removed).

On appeal, Mote's argument that Colonel Jones was not entitled to respect focuses on alleged discrimination

against him at the base's diversity festival. *See* In. Br. 10–11, 16–18. However, no evidence presented by Mote demonstrates that he was a victim of discrimination at the diversity festival, and, in fact, it demonstrates the opposite. Colonel Jones's email informed Mote that his request to have a White Heritage booth was denied because it was "not an approved DoD organization" and that his "EO appeal [was] going through the process." S.A. 82. It concluded that Mote was "welcome to come to the event and participate *just like any member at Hill AFB*." *Id.* (emphasis added); *see Decision* at 503 ("Based on these essential facts, a disinterested observer could not reasonably conclude that this order was evidence of anti-white discrimination by Colonel Jones."). If any conclusion can be drawn from the record of events at the diversity festival presented by Mote, it is that he disrespected other members of the Air Force at the festival. *See* Inf. Br. 16–18. The CDI report requested by Mote following the festival found that Mote was "looking for a fight," "annoying . . . booth attendants and guests," and "baiting" and "laughing" at his subordinate in a conversation about his White Heritage booth application. S.A. 85–86 (finding that Mote's subordinate did not violate Article 89 during their conversation when Mote "targeted [her] for extended questioning and baited her with inflammatory rhetoric"); *Decision* at 499 ("[Mote]'s conduct in its entirety was what led to the divesture of his Article 89 protections."). Mote has failed to present any cogent argument as to why Colonel Jones should have been divested of Article 89 protections. Mote has therefore failed to demonstrate that AFBCMR's conclusion that he was not a victim of material error or injustice was not supported by substantial evidence.

Mote next argues that his January 9, and January 13, 2017 emails to Colonel Jones were protected communications under the MWPA. Inf. Br. 19–20. He argues that the AFBCMR incorrectly concluded that he failed to allege wrongdoing in those emails. *Id.* A protected

communication must identify government actions supporting an objectively reasonable belief that the identified actions constitute wrongdoing of the sort specified in the MWPA. *See Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999) (concluding that, under the related Whistleblower Protection Act, 5 U.S.C. § 2302, "the proper test is this: could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence [wrongdoing]?"). Mote's emails are reproduced in their entirety above. *See* S.A. 122, 124. Rather than identify any specific government actions objectively supporting a reasonable belief of unlawfulness or other cognizable wrongdoing, it can be seen that "[Mote]'s emails . . . are lengthy diatribes mocking the commander's efforts to ensure diversity and inclusion within his unit." S.A. 303 (AFLOA/JAJM advisory opinion analyzing Mote's emails); *see* S.A. 7 (noting that the AFBCMR "concur[red] with the rationale and recommendation" of the AFLOA/JAJM). The emails on their face support the AFBCMR's conclusion that they were not protected communications under the MWPA, as they identify no specific government actions that could objectively and reasonably be viewed as cognizable wrongdoing. S.A. 6; *see also* S.A. 122, 124; *Decision* at 502–03. The AFBCMR's conclusion that Mote was not the victim of reprisal under 10 U.S.C. § 1034 was therefore supported by substantial evidence.

Finally, with respect to Mote's Sixth Amendment argument, the Claims Court correctly found that Mote was not entitled to rights under the Sixth Amendment in an Article 15 NJP proceeding. *See Middendorf v. Henry*, 425 U.S. 25, 31–32 (1976). An Article 15 proceeding is not a criminal proceeding entitling a defendant to Sixth Amendment rights; rather, it is an "administrative method of dealing with the most minor offenses." *Id.* But Mote's argument does not seem to be that he was denied effective counsel during his NJP proceeding, but rather that he was denied

effective counsel in the 72 hours that he had to elect a court-martial or the NJP. *See* Inf. Br. 13–14, 21–22.

We have considered similar argument in the past and found that Article 15 provides a statutory right to trial by court-martial and any waiver of that right must be voluntary. *See Fairchild v. Lehman*, 814 F.2d 1555, 1558–60 (Fed. Cir. 1987) (considering "what rights [the accused] had at the time he elected nonjudicial punishment rather than trial by court-martial"). In *Fairchild*, we considered if that waiver complied "with the standards set forth in *Brady v. United States*, 397 U.S. 742, 748 (1970) regarding waiving constitutional rights." 814 F.2d at 1559 (cleaned up). "*Brady* required that waivers: 'not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *Id.* (quoting *Brady*, 397 U.S. at 748).

Here, Mote was given the opportunity to consult with his attorney the same day he was accused. *Decision* at 494. His attorney advised him that it would be in his "best interest to fight this in the Article 15 forum" and that his defenses were "very unlikely" to be successful. *Id.*; S.A. 145. On January 20, 2017, prior to the 72-hour deadline, Mote's attorney provided a more detailed analysis of his charges, defenses, and maximum penalties. S.A. 145–57. Although Mote may have been dissatisfied with the content or exact timing of that advice, he has failed to demonstrate that his waiver of his right to a court-martial was not voluntary or that he was misinformed of the consequences of selecting the NJP proceeding over a court-martial. *Cf. Fairchild*, 814 F.2d at 1559–60 (finding that the accused could not properly waive his right to court-martial when he was incorrectly informed that he "could not receive an adverse discharge" in an NJP proceeding). We therefore see no basis to find that Mote's right to counsel was violated.

The AFBCMR's decision with respect to the NJP was therefore not arbitrary, capricious, contrary to law, or

unsupported by substantial evidence. The judgment of the Claims Court denying Mote's request for backpay and removal of the NJP from his records is therefore affirmed.

## CONCLUSION

We have considered Mote's other arguments and find them unpersuasive. For the foregoing reasons, we *affirm* the decision of the Claims Court entering judgment on the administrative record relating to the NJP but *vacate* the portion that purported to review the LOA and *remand* to the Claims Court for a determination if it has jurisdiction under the Tucker Act over the claim for removal of the LOA from his military records.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMAND**

## COSTS

No costs.